IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARTURO J. GONZALEZ SR,

        Plaintiff,

  v.

MICHAEL ASTRUE, Commissioner of Social
Security,

        Defendant.

_____/

No. C -10-04570 EDL

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN
PART DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
REMANDING CASE**

On October 8, 2010, Plaintiff Arturo Gonzalez filed this suit pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a decision denying his claim for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. § 400 et seq.  He filed an amended complaint on January 5,

2011 and thereafter filed a motion for summary judgment, asking the Court to reverse the final

decision of the Commissioner and find him "disabled" under the Social Security Act, or

alternatively, remand the case for a new hearing.  For the following reasons, the Court grants in part

and denies in part Plaintiff's motion for summary judgment, and grants in part and denies in part

Defendant's cross-motion for summary judgment.  The Court remands this matter for a further

hearing.

**PROCEDURAL BACKGROUND**

      Mr. Gonzalez filed an application for Social Security disability insurance benefits under Title

II of the Social Security Act on November 26,2008.  Administrative Record ("AR") at 143-144.  He

alleged that he became disabled on November 30, 2006 due to "cervical spine" and depression.  AR

164.  Mr. Gonzalez claimed that his impairments prevented him from working because he could not

stand, walk, or sit for prolonged periods of time and was unable to lift or carry anything over ten

pounds.  Additionally, he claimed pain, fatigue, difficulty concentrating, and frequent severe

**United States District Court**
For the Northern District of California

headaches that "limit his ability to do any type of activity." AR 164.  Mr. Gonzalez's application was denied initially, upon reconsideration, and by an Administrative Law Judge ("ALJ") in a decision dated February 25, 2010.  AR 11-19.  In a decision dated August 11, 2010, Mr. Gonzalez's request for review of the ALJ's decision was denied.  AR 1-3.  Mr. Gonzalez then timely commenced this action for judicial review pursuant to 42 U.S.C. 405(g).

**FACTUAL BACKGROUND**

**A.    Medical History**

Mr. Gonzalez was born on May 7, 1960.  AR 143.  From 1992 to 1993, he worked in "Quality," and then owned a graphic design business and was self employed from 1998 until the end of November 2006.  AR 165.  In approximately 1994, Mr. Gonzalez suffered a work-related injury which threw his neck and upper back backwards and required cervical spine fusion surgery at C5-7. AR 341, 511.  After the surgery, Plaintiff's pain improved, but he took pain medication to control it. AR 511.  Mr. Gonzalez tried a number of pain treatments including nerve blocks, medial branch blocks, epidural injections, and medication.  AR 511.  Mr. Gonzalez stopped working and sold his business and believed he would be able to support his family with the proceeds, but the proceeds were invested in a ponzi scheme and disappeared.  AR 95.

**1.    Dr. Taylor**

Between 1997 and 2008, Mr. Gonzalez saw Dr. Patrick Taylor for treatment of his neck and upper extremity pain and headaches.  See generally AR 310-427.  In June 2000, Mr. Gonzalez reported pain in his neck and left shoulder that came on spontaneously.  AR 412.  Dr. Taylor noted that Mr. Gonzalez was "not doing well" likely due to degenerative changes occurring above or below the level of the previous fusion surgery.  AR 412.  Dr. Taylor re-prescribed Darvocet.  AR 412.  In July 2001, Dr. Taylor noted that Mr. Gonzalez continued to work and take Darvocet, and that his shoulder pain became almost unbearable if he tried to stop the medication.  AR 409.  In February 2003, Dr. Taylor noted that Mr. Gonzalez was still working and taking Darvocet daily, and that his pain worsened with activities.  AR 406.  In August 2003, Dr. Taylor saw Plaintiff for "continued problems and because of his chronic use of pain medication" and noted that Mr. Gonzalez continued to work despite the aching pain in his neck and shoulder and that the Darvocet

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   helped him get through the day.  AR 404.  In November 2004, Mr. Gonzalez complained of frequent

2   headaches radiating from his neck up to the back of his head. AR 390. An MRI of the cervical spine

3   revealed a "rather prominent disc protrusion midline bilaterally at the C4-5 level." AR 390.

4         In January 2006, approximately one year after his last appointment, Mr. Gonzalez

5   complained to Dr. Taylor of increasing pain in the left side of his neck, radiating to his shoulder.

6   AR 388.  Examination revealed tenderness and limitation of cervical motion.  AR 388.  Dr. Taylor

7   noted that Mr. Gonzalez "may be developing increasing difficulty above or below the previous

8   surgery" related to the added stresses placed on those discs by virtue of being fused.  AR 388.  In

9   May 2008, Dr. Taylor noted that Mr. Gonzalez reported increasing and progressive pain on the left

10  side of his neck and skull base radiating to his upper extremity.  Dr. Taylor noted that he continued

11  to take Darvocet two or three times daily, and that it was not uncommon for a patient to experience

12  degenerative changes in the spine at the next level up from a fusion.  AR 345.  Dr. Taylor diagnosed

13  chronic cervical disc syndrome, status post two level anterior discectomy and fusion.  AR 345.

14        In July 2008, Mr. Gonzalez complained of pain in his neck and left shoulder and headaches

15  which extended up from the neck to the back of his head.  AR 339.  An examination revealed limited

16  range of neck motion and tenderness on the left side. AR 339.  Dr. Taylor noted that x-rays showed

17  degenerative changes at C4-5, just above the level of the fusion, but that Mr. Gonzalez was "hesitant

18  to even consider surgery, quite understandably." AR 339.

19        In August 2008, Mr. Gonzalez continued to be quite symptomatic with neck pain radiating

20  up into his head, over his left shoulder almost to his elbow.  AR 333. Dr. Taylor noted that the

21  medication "barely holds him and that the pain is constant."  AR 333.  An examination revealed

22  limited range of motion in his neck and tenderness on the left side.  AR 333. Dr. Taylor noted that x-

23  rays showed degenerative changes at C4-5, above the level of his previous fusion. AR 333.  Dr.

24  Taylor sought authorization for a cervical MRI, noting that Mr. Gonzalez's pain correlated with

25  degenerative changes, that the pain was intractable, and that there were neurological findings.  AR

26  333-334.  Dr. Taylor also noted that Mr. Gonzalez was a "well-motivated individual" and that

27  shoulder pain and headaches are "part and parcel of [his] cervical pain syndrome." AR 334.  Dr.

28  Taylor also noted that it is "well-known medically that anterior discectomy and fusion puts more

United States District Court
For the Northern District of California

1  strain on levels above and below which, over the years, are often accelerated in their degenerative

2  changes to the point of requiring further surgery, even 20 to 30 years later." AR 334.  Dr. Taylor

3  determined that Plaintiff was capable of "light work" at that time.  AR 334.

4      In September 2008, an MRI of the cervical spine revealed status post inter-body fusion at

5  C5-6 and C6-7 and a broad-based diffuse annular bulge at C4-5 with mild central canal narrowing.

6  AR 326-327.  Upon examination in September 2008, Mr. Gonzalez reported worsening pain that

7  forced him to lie down during the day despite taking medication.  AR 331.  Dr. Taylor noted that the

8  MRI was typical of recurrent cervical problems after spinal fusion, especially after the number of

9  years since the surgery, and that the findings on the MRI explained Mr. Gonzalez's pain.  AR 332.

10  Dr. Taylor stated that Plaintiff should be considered "temporarily partially disabled, capable of half-

11  time work with frequent breaks if he is using a computer" and recommended epidural steroid

12  injections.  AR 332.

13      In November 2008, Mr. Gonzalez's symptoms had worsened, and he was more depressed.

14  AR 322.  Examination revealed limitation of neck motion and tenderness on the left side.  AR 322.

15  Dr. Taylor stated that Mr. Gonzalez remained temporarily totally disabled.  AR 323.  Mr. Gonzalez

16  saw Dr. Taylor again in January 2009.  Dr. Taylor noted that Mr. Gonzalez continued to be quite

17  depressed because of his persistent headaches, which were "cervicogenic without a doubt."  AR 526.

18  Dr. Taylor opined that Mr. Gonzalez remained temporarily totally disabled.  AR 527.  In February

19  2009, Dr. Taylor noted that Mr. Gonzalez's pain continued, particularly his headaches, and that Mr.

20  Gonzalez was quite depressed and taking anti-depressants.  AR 516.  Mr. Gonzalez reported that the

21  Darvocet was losing its effect, and asked for something more effective.  AR 516.  Dr. Taylor stated

22  that Mr. Gonzalez was temporarily totally disabled at that time.  AR 517.  In June 2009, Dr. Taylor

23  noted that Mr. Gonzalez's pain and headaches persisted.  AR 524.  Dr. Taylor prescribed Ultram

24  because the Darvocet was no longer effective. AR 525.  Dr. Taylor opined that Mr. Gonzalez

25  remained temporarily totally disabled.  AR 525.

26      In August 2009, Dr. Taylor rendered a medical opinion regarding Mr. Gonzalez's ability to

27  do work-related activities.  AR 508-510.  Dr. Taylor opined that the maximum weight that Mr.

28  Gonzalez could lift and carry on an occasional basis was ten pounds, the maximum weight that Mr.

United States District Court
For the Northern District of California

Gonzalez could lift and carry on a frequent basis was less than ten pounds.  AR 508.  He also opined that the maximum ability Mr. Gonzalez could stand and walk with normal breaks during an eight-hour day was about four hours and the maximum ability he could sit with normal breaks during an eight-hour day was about four hours.  AR 508.  Dr. Taylor stated that Mr. Gonzalez needed the opportunity to shift at will from sitting to standing/walking.  AR 509.  He also stated that Mr. Gonzalez should never twist, stoop or climb ladders and that he could occasionally crouch or climb stairs.  AR 509.  Additionally, Mr. Gonzalez's ability to reach, push and pull were affected by his impairment.  AR 509.  Dr. Taylor also stated that Mr. Gonzalez's impairments would cause him to be absent from work more than three times a month.  AR 510.

### 2.    Dr. Richard Derby

In December 2008, Dr. Taylor referred Mr. Gonzalez to Dr. Richard Derby for an epidural injection at C5.  AR 475.  Dr. Derby noted that Mr. Gonzalez's symptoms were worse with loading of the spine during sitting, standing, and walking and that he was somewhat better when lying down.  AR 475.  In a follow-up visit in January 2009, Mr. Gonzalez reported no relief from the headaches or left axial pain or midline burning pain, but had significant relief from left trapezius and tricep pain.  AR 480.  Mr. Gonzalez saw Dr. Derby again in February 2009 for a medial branch block at C3, C4, C5, and C6.  AR 482.  In March 2009, Mr. Gonzalez reported 40% relief from upper shoulder pain, but no relief of the left upper axial pain and headaches, which he described as constant with throbbing and burning.  AR 486.  Mr. Gonzalez saw Dr. Derby again in June 2009 for a greater occipital nerve block.  AR 518-520.  Dr. Derby noted that Mr. Gonzalez had several sources of pain and that the pain was "quite disabling" to him.  AR 520.

### 3.    Mental Health Evaluations

In early 2009, Mr. Gonzalez saw Jean B. Taylor, a licensed clinical social worker and Dr. Mark Heitner, M.D., a psychiatrist, for mental health treatment.  AR 445-457.  In September 2009, Dr. Heitner rendered a medical opinion regarding Mr. Gonzalez's ability to do work-related activities.  AR 535-538.  Dr. Heitner stated that Mr. Gonzalez consistently tested in the severe range on the Beck Depression test "by self-report."  AR 535.  Dr. Heitner opined that Mr. Gonzalez had a poor or no ability to maintain attention for two hour segments; maintain regular attendance and be

punctual within customary tolerances; make simple work related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; deal with normal work stress; and carry out detailed instructions.  AR 536-537.  Dr. Heitner also opined that Mr. Gonzalez had a fair ability to remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; understand and remember detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; and maintain socially appropriate behavior.  AR 536-537. Dr. Heitner also opined that Mr. Gonzalez's impairments would cause him to be absent from work more than three times a month.  AR 538.

In January 2009, Plaintiff saw Jonathan Howard, Psy.D., for a consultative psychological examination at the request of the SSA.  AR 433-436.  During a mental status examination, Dr. Howard noted that Mr. Gonzalez appeared depressed, and he reported depressed and anxious mood with sleep disturbance, decreased appetite, decreased energy, and difficulty with concentration.  AR 434.  Dr. Howard noted that Mr. Gonzalez  "appeared sad" during the evaluation  AR 434.  He also noted that Mr. Gonzalez's attention and concentration appeared impaired as he was unable to perform serial three's or repeat five digits backwards, though he was able to accurately subtract $7.50 from $18.00.  AR 434. Dr. Howard's diagnostic impression was mood disorder, not otherwise specified with depressed and anxious features.  AR 435.   Dr. Howard stated that Mr. Gonzalez appeared depressed and that his ability of immediate memory and his ability of attention and concentration appeared impaired.  AR 435.  Because of Mr. Gonzalez's level of functioning and mood disorder, Dr. Howard found him likely "to have marked difficulty performing detailed and complex tasks, moderate to marked difficulty performing simple and repetitive tasks, and moderate

to marked difficulty dealing with the usual stresses encountered in competitive work.  AR 435.  He also stated that Mr. Gonzalez was not capable of managing his own funds toward his best interest. AR 435.

In March 2009, Dr. Mario Morando, a state agency physician, completed a Psychiatric Review Technique form which stated that Mr. Gonzalez was mildly limited in his activities of daily living; moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace; and moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to interact appropriately with the general public.  AR 458-470.

**B.   ALJ HEARING**

A hearing before an Administrative Law Judge was held on November 30, 2009.  AR 48-125.  During the hearing, Mr. Gonzalez testified that he had not worked since December 2006.  AR 58, 60, 95.  He had a successful business, but he got rid of it because he could not continue working anymore.  AR 95.  His primary complaint was pain in his neck radiating to his head, shoulder, and left arm and hand.  AR 61-63.  He claimed that if he reached overhead with his left arm, he experienced pain in his left shoulder radiating down his arm and hand as well as headaches that lasted all day.  AR 62-64.  He noted that he had fusion surgery in his cervical spine, and had deterioration at levels C3-4 and C4-5.  AR 69.  He testified that his doctor recommended another fusion surgery, but he did not want to have another surgery because of the "domino effect" of the fusion surgery.  AR 67.  Plaintiff claimed that he did not know that the first fusion surgery was going to cause a deterioration in the vertebrae around the fused vertebrae, and his doctors could not guarantee that a second fusion would be successful in alleviating his pain.  AR 67-70. He noted that he was prescribed a "TNS" unit to help alleviate his pain, and that he saw psychiatrist Dr. Heitner, every two or three weeks, and was medicated for his depression.  AR 70, 75-78.  Plaintiff also testified that in January 2009 he took a graphic design course where he did "okay" despite missing a lot of days.  AR 79-80.  He stated that he could not concentrate for long periods of time because of pain and was currently taking Darvocet.  AR 82.  He further claimed that he had headaches lasting all day; lied down, used a heating pad, a neck brace, and a home traction unit to alleviate the pain;

and took naps two or three times a day lasting from a half hour to one hour.  AR 90-93.  He testified that he drove once or twice a week around his neighborhood, but could not work because whenever he sat in front of a computer for half an hour, his pain returned. AR 86, 99.

A medical expert orthopedic surgeon, Dr. Schosheim, also testified at the hearing.  AR 97-105. Dr. Schosheim testified that he believed that Mr. Gonzalez could lift twenty pounds occasionally and lift and carry ten pounds frequently; stand or walk with normal breaks for a total of six hours in an eight-hour day; sit with normal breaks for a total of six hours in an eight-hour day; push and/or pull twenty pounds occasionally and ten pounds frequently; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance, stoop, and kneel; occasionally crouch and crawl; occasionally use his left arm for overhead reaching; no limitations on gross or fine manipulation; and needs to avoid all exposure to hazardous machinery, heights, and vibration, including hand tools, as well as heavy vibration such as a jack hammer.  AR 103-104.

Mr. Beaman, a vocational expert, testified that, given the functional limitations described by Dr. Schosheim, Mr. Gonzalez could not perform his past work as a graphic designer or design manager as he performed it. AR 105-125.  However, Mr. Gonzalez would be able to perform his past work as it is performed according to the Dictionary of Occupational Titles ("DOT").  AR 113. Mr. Beaman also testified that, if an individual was absent from work two days a month, the person would be unemployable.  AR 121-22.

## C.    ALJ DECISION

In a decision dated February 25, 2010, the ALJ found that Mr. Gonzalez had the following severe impairment: "status post two level cervical fusion with residual chronic left sided temporal pain, neck and left arm pain; cervical disc bulge at C4-5," and that his depression and obstructive sleep apnea were not severe impairments because they did not impose more than minimal limitations and arose directly from his physical impairments and perceptions.  AR 13. The ALJ found that Mr. Gonzalez retained the residual functional capacity ("RFC") to perform light work "except occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand and walk for six hours in an eight hour day and sit for six hours in an eight- hour day; push and or pull twenty pounds occasionally and ten pounds frequently; never climb ladders, ropes or scaffolds; occasionally

climb ramps or stairs, crouch, crawl; needs occasional use of the left arm reaching overhead but otherwise can reach in all directions; no gross or fine limitations in use of the hands and or manipulation; no visual or communicative deficits; should avoid hazardous machinery, heights, and heavy vibrations, such as jackhammers, including hand power tools." AR 15.

The ALJ made his RFC conclusion after discussing evidence from a number of treating and non-treating doctors, and determining that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible to the extent they [we]re inconsistent" with the RFC assessment. AR 17.  The ALJ noted that, while Plaintiff's pain had an objective basis (bulging disk), the issue was whether the extent of pain precluded him from all work activities.  AR 17.   The ALJ credited the opinion of consulting medical expert Dr. Schosheim over that of treating physician Dr. Taylor regarding Plaintiff's pain relating to his back and headaches.  AR 18.  The ALJ further found that Plaintiff's claimed level of pain was not credible because he was not prescribed narcotic pain medication, had not been referred to a pain clinic, and no doctor had stated unequivocally that he needed surgery.  The ALJ also relied on the fact that Plaintiff volunteered several hours per week, could drive and care for his personal needs, and performed some work after the claimed onset.  AR 17.  The ALJ afforded limited weight to the medical opinions regarding Plaintiff's claimed depression, because while Plaintiff "clearly ha[d] some degree of depression . . . the extent of treatment and medication usage is not consistent with a condition that would more than minimally affect his ability to perform the basic requirements of work." AR 18.

Additionally, the ALJ found that Mr. Gonzalez could perform his past work as a graphic designer and manager/designer at the sedentary or light exertional levels as they are performed in the national economy.  AR 18-19.  Based on the testimony of the vocational expert, the ALJ determined that Plaintiff could perform other unskilled jobs at the light exertional level and therefore was not disabled. AR 18-19.

**STANDARD OF REVIEW**

According to 42 U.S.C. § 405(g), the Court's jurisdiction is limited to determining whether

the findings of fact in the ALJ's decision are supported by substantial evidence or were premised on legal error. 42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). Substantial evidence is defined as relevant evidence which a reasonable person might accept as adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance." Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

To determine whether the ALJ's decision is supported by substantial evidence, courts review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision. Sandgathe, 108 F.3d at 980 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995.) If the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's conclusion. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). The trier of fact, not the reviewing court, must resolve conflicting evidence, and if the evidence can support either outcome, the reviewing court may not substitute its judgment for the judgment of the ALJ. Id.; see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992). An ALJ's decision will not be reversed for harmless error. Id.; see also Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991).

**A.    Definition and Determination of Disability**

In order to qualify for disability insurance benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA utilizes a five-step sequential evaluation process in making a determination of disability. 20 C.F.R. § 404.1520 (2009); see Reddick, 157 F.3d 715, 721. If the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the determination and does not go on to the next step; if the determination cannot be made, then the SSA moves on to the next step. 20 C.F.R. § 404.1520.

First, the SSA looks to the claimant's work activity, if any; if the claimant engages in substantial gainful activity, he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(I). Second, the SSA considers whether the claimant suffers from a severe impairment or number of impairments

10

which has lasted or is expected to last twelve months or end in death.  20 C.F.R. § 404.1520(a)(4)(ii).  Third, the SSA considers the severity of the impairments; the claimant is disabled if he or she has an impairment that meets or equals one of the listings set forth in 20 C.F.R., part 404, subpart P, appendix 1, which sets forth impairments whose level of severity conclusively establishes disability, irrespective of vocational factors.  20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, the SSA considers the residual functional capacity ("RFC") and past relevant work; if the claimant can still engage in past relevant work, he or she is not disabled.   20 C.F.R. § 404.1520(a)(4)(iv).  Fifth, the SSA again considers the RFC and age, education, and work experience to see if the claimant is able to make an adjustment to another occupation in the national economy.  20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

**B.     Credibility**

In determining whether a claimant's testimony regarding subjective pain or symptoms is credible, the ALJ must engage in a two-step process.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  First, the ALJ must determine whether the claimant has submitted objective medical evidence of the underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  Id. (citing Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991).  Next, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of his symptoms by offering specific, clear and convincing reasons for doing so.  Id. at 1036 (citing Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)).  If the ALJ's credibility finding is supported by substantial evidence in the record, the Court may not second-guess the ALJ's finding. Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002); see also Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999)

**DISCUSSION**

Plaintiff argues that the ALJ erred by: (1) failing to provide sufficient reasons for discounting the opinions of treating and examining physicians; (2) rejecting Plaintiff's testimony as not credible; (3) finding that Plaintiff does not have a "severe mental impairment;" and (4) relying on the vocational expert's conclusion.

United States District Court
For the Northern District of California

11

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.      The ALJ Erred by Failing to Provide Sufficient Reasons For Discounting the Uncontroverted Opinion of Plaintiff's Treating Physicians**

Plaintiff contends that the ALJ did not provide clear and convincing reasons, supported by substantial evidence, for rejecting the uncontroverted opinion of treating physicians Dr. Taylor and Dr. Heitner, and examining physician Dr. Howard.  The SSA counters that none of the treating or examining opinions in question are uncontroverted, and that the ALJ provided sufficient reasons for giving greater weight to other doctors' opinions.

The SSA generally gives more weight to the opinions of treating sources because of their ability to provide a "detailed, longitudinal picture" of the plaintiff's impairments, and because the treating sources have a greater opportunity to know and observe the plaintiff as an individual.  See 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  If the treating source's opinion is found to be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record," it will be given controlling weight.  20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2); Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).  "A finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected."  Orn, 495 F.3d at 631-632.  To reject the opinion of a treating source that conflicts with that of an examining source, the ALJ must "make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."  Magallanes, 881 F.2d at 751 (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).  An ALJ may reject the uncontroverted opinion of a treating source only if he presents clear and convincing reasons supported by substantial evidence in the record for doing so.  See Orn, 495 F.3d at 632, Magallanes, 881 F.2d at 751 (citing Rodriguez v. Bowen, 876 F.2d 759, 762 n.8 (9th Cir. 1989); see also Smolen, 80 F.3d at 1285 (citing Rodriguez, 876 F.2d at 761-762)).  Here, the issue is whether the medical opinions were contradicted and whether the ALJ presented clear and convincing reasons supported by substantial evidence for giving them less weight than other, non-treating or examining opinions.

12

**1.    Dr. Taylor**

The ALJ found that Plaintiff had been treated by orthopedic neurosurgeon Dr. Taylor since 1997, and that over the years Dr. Taylor had prescribed pain medication and epidural steroid injections and opined that Plaintiff might need repeat surgery.  AR 16.  In his "Medical Opinion Re: Ability to Do Work Related Activities," Dr. Taylor opined that, among other things, Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds and would be absent from work more than three times a month.  AR 508-510.  He based this conclusion on medical findings of "disk protrusion @ C4,5 above previous fusion & limitation of motion of neck."  AR 509-510.  Yet the ALJ afforded greater weight to the opinion of consulting medical expert Dr. Shosheim because he is also an orthopedic surgeon and a specialist and Dr. Taylor's opinion was "based at least in part on the claimant's subjective reported level of pain," which the ALJ specifically discounted for the reasons discussed below.  AR 18.  Additionally, the ALJ relied on the fact that Dr. Taylor's records from 2007 show that Plaintiff's pain was not severe enough to warrant regular treatment other than medication and a twelve-month follow up.  AR 18.

Significantly, however, the ALJ erred in failing to provide clear and convincing reasons supported by substantial evidence in the record to discount Dr. Taylor's uncontroverted opinion that, given Plaintiff's condition, Plaintiff would be absent from work more than three times per month.  AR 510; see also AR 538 (Dr. Heitner's opinion that Plaintiff would be absent more than three times a month).  The ALJ simply stated that he was "not sure" the three-day absence conclusion was accurate, but provided no justification for this opinion.  AR 121.  Neither the ALJ opinion nor the government's opposition fully addresses this point, or the fact that the vocational expert testified that someone who was absent from work twice a month would be "not employable."  AR 122.  Thus, the ALJ erred in rejecting Dr. Taylor's uncontroverted opinion.

The ALJ did not err in his treatment of Dr. Taylor's other evidence.  Plaintiff argues that the ALJ's conclusion that Dr. Taylor's opinion was based on Plaintiff's subjective complaints is not supported by evidence, and instead the record shows that Dr. Taylor's opinion was based on objective medical findings.  See AR 321-23 (report following examination stating that he "probably will ultimately require further cervical spine surgery" and remained TTD), 331-34 (reports

**United States District Court**
For the Northern District of California

1  discussing Plaintiff's self report, MRI results, and neurological findings and recommending an MRI

2  and epidural steroid injections and determining him capable of light work), 339-40 (report following

3  evaluation of xrays and seeking authorization for traction unit), 344-45 (report following

4  examination diagnosing chronic cervical disk syndrome), 358-59, 388-97, 404-07, 409, 412, 424-26.

5  However, a review of Dr. Taylor's reports indicates that his conclusions were based on *both* his

6  examination of Plaintiff and Plaintiff's self-reports about his pain.  There was substantial evidence in

7  the record to support Plaintiff's self-reporting as a reason for discounting Dr. Taylor's opinion.

8         Plaintiff also argues that the ALJ's reliance on the fact that Dr. Taylor did not require follow

9  up more frequently than every twelve months is belied by the record, because on August 27, 2008,

10  Dr. Taylor stated: "I will see him in 12 months, or sooner as necessary."  AR 358-59.  Plaintiff

11  points out that he was seen again ten months later, and obtained other treatment in the meantime.

12  AR 345.  However, the ALJ could reasonably interpret Dr. Taylor's decision that he only needed to

13  see Plaintiff every twelve months "or sooner as necessary" as contradictory to his opinion that

14  Plaintiff had  extreme limitations.

15         Additionally, Plaintiff contends that the government's other justifications for the ALJ's

16  decision to discount Dr. Taylor's opinion should be ignored, because the ALJ himself did not proffer

17  those justifications to support his conclusion.  See Stout v.  Commissioner of Social Security, 454

18  F.3d 1050, 1054 (9th Cir. 2006) (court limited to reasons asserted by ALJ). Specifically, the SSA

19  argues that the ALJ properly discredited Dr. Taylor because his opinion was contradicted by other

20  evidence in the record, such as: Dr. Gable's notation that Plaintiff was "muscular" (AR 18, 430-31)

21  and reports that Plaintiff was doing construction and other jobs during his period of disability (AR

22  18, 247, 282).  A review of the ALJ's decision as a whole, however, shows that he noted these

23  inconsistencies.  AR 18.  These are also specific reasons based on substantial evidence supporting

24  the ALJ's decision to discredit Dr. Taylor in favor of Dr. Schosheim.  See Magallanes at 755 ("[a]s a

25  reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences

26  from the ALJ's opinion . . . if those inferences are to be drawn").

27         Finally, Plaintiff contends that the ALJ provided insufficient reasons for his decision to give

28  more credit to Dr. Schosheim, who neither treated nor examined Plaintiff.  See Lester v. Chater, 81

**United States District Court**
For the Northern District of California

F.3d 821, 831 (9th Cir. 1995) ("opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician"). However, the ALJ could properly rely on Dr. Schosheim's opinion in conjunction with other evidence in the record to discredit Dr. Taylor's opinion. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).

In sum, the ALJ erred in failing to provide clear and convincing reasons supported by substantial evidence for rejecting Dr. Taylor's uncontroverted opinion that Plaintiff would be absent from work more than three times per month, especially in light of Dr. Heitner's agreement with that opinion and the vocational expert's testimony that a person who is absent from work two times per month is unemployable. Accordingly, Plaintiff's motion for summary judgment is granted in part. This matter is remanded for determination of whether consideration of Dr. Taylor's uncontroverted opinion would change the ALJ's decision in this case.

### 2.    Dr. Heitner

Plaintiff contends that the ALJ erred by failing to provide clear and convincing reasons supported by substantial evidence for discounting treating physician Dr. Heitner's opinion regarding Plaintiff's depression. The ALJ found that Plaintiff saw Dr. Heitner once and the information was based on Plaintiff's self-report, and therefore accorded "limited weight to [his] opinion regarding the functional restrictions due to depression." AR 14, 18; see also AR 536-38 (Dr. Heitner's Medical Opinion Re: Ability to Do Work Related Activities" finding "Beck Depression test consistently in the severe range by self-report."). Plaintiff points to some evidence that he was scheduled to see Dr. Heitner more than once. See AR 78 (Plaintiff's testimony that he saw him every two to three weeks), AR 218 (Plaintiff's appeal form listing two prior appointments and a future appointment). However, there are no medical records or reports substantiating his claim of multiple visits.[1]

---

[1]        Plaintiff claims that the ALJ should have requested additional records from Plaintiff to more fully develop the record regarding Plaintiff's claimed multiple visits to Dr. Heitner. However, Plaintiff has not requested that the record before this Court be supplemented or attached any missing medical records to his brief that might substantiate his claim of additional visits. If he had done so, the Court could have decided whether the newly submitted evidence would warrant remand. See Kubitscheck, Social Security Disability Law and Procedure, § 8:9 ("If the claimant has new evidence which is probative of disability, the clamant may seek a remand so that the [SSA] may consider that evidence. The court may consider the new evidence only to the extent of determining whether the new

1   Further, Plaintiff contends that there is no evidence that Dr. Heitner's conclusion was based on self-

2   report, but the medical opinion states that it is based at least in part on Plaintiff's self-report.  See

3   AR 535-38.  Alternatively, Plaintiff argues that even if it was based on self-report, the Beck test is a

4   widely used gauge of depression that relies on self-reporting, so this was not a good reason to

5   disregard Dr. Heitner's opinion.

6          The ALJ was within his discretion to give less weight to Dr. Heitner's assessment due to the

7   limited nature of his treatment and because it was based at least in part on Plaintiff's self-reporting.

8   The ALJ also rejected a diagnosis of disabling depression because the extent of Plaintiff's treatment

9   and medication was not consistent with a condition that would more than minimally affect his ability

10  to perform the basic requirements of work.  AR 18.  Although the ALJ did not fully explain this

11  conclusion or cite evidence to support it, he was within his discretion to discredit Dr. Heitner's

12  opinion on other grounds, and this does not constitute reversible error.

13         **3.     Dr. Howard**

14         The ALJ accorded limited weight to the opinion of consultative examiner Dr. Howard

15  because Plaintiff saw Dr. Howard only once and "the extent of treatment and medication usage is not

16  consistent with a condition that would more than minimally affect his ability to perform the basic

17  requirements of work."  AR 18.  Dr. Howard examined Plaintiff at the request of the SSA, and noted

18  that he appeared depressed and sad, his attention and concentration appeared impaired, he was able

19  to accurately subtract two numbers but not to perform serial threes or repeat five digits backwards,

20  and his fund of knowledge was fair to good.  AR 433-34.  Dr. Howard diagnosed "mood disorder,

21  NOS, with depressed and anxious features" and a Global Assessment of Functioning ("GAF") score

22  of 60.  AR 433, 435.  He found that Plaintiff would have "marked difficulty performing detailed and

23  complex tasks, moderate to marked difficulty dealing with the usual stresses encountered in

24  competitive work" and would be incapable of managing his own funds toward his best interest.  AR

25  435.

26         Although Plaintiff contends that the ALJ erred in discounting this opinion simply because

27

28  evidence warrants a remand.")  Since Plaintiff did not attach additional records, the Court is limited to
    determining whether the existing record was adequate to support the ALJ's finding.

**United States District Court**
For the Northern District of California

Dr. Howard only saw Plaintiff once, the point of a consultative examiner is to see the patient once. Moreover, Plaintiff argues that rejecting Dr. Howard's opinion on this basis is inconsistent with the ALJ's reliance on Dr. Schosheim, who also had limited interaction with Plaintiff.  However, the government counters that Dr. Howard did not diagnose depression, and the GAF score of 60 is indicative of only moderate symptoms.  Additionally, the government points out that Dr. Howard did not identify any records he relied on and his report contained no objective evidence of impairment, he used qualifying language throughout the report ("appeared impaired," "apparent level of functioning," "likely" have difficulty), and his conclusion that Plaintiff could not manage his own funds contradicted his finding that Plaintiff could perform monetary calculations and other evidence in the record that Plaintiff performed work and volunteer activities.

In his Reply, Plaintiff points out that the ALJ did not specify that he rejected Dr. Howard's opinion based on lack of objective medical records or any contradictions to other evidence, and contends that the Court should not consider these new rationales.  However, even if the ALJ failed to give sufficient reasons for rejecting Dr. Howard's opinion, this does not warrant remand.  Dr. Howard did not diagnose Plaintiff with depression or any other severe disabling condition, so even if it should have been considered, there has been no showing that it would have changed the ALJ's conclusion.

**B.    The ALJ Erred in Failing to Provide Clear and Convincing Reasons For Discounting Plaintiff's Pain Testimony**

Plaintiff also contends that the case should be remanded because the ALJ failed to provide clear and convincing reasons supported by evidence in the record to reject Plaintiff's testimony as "not credible."  "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'"  Orn v. Astrue, 495 F.3d 625, 636 (9th Cir. 2007).

The ALJ found that Plaintiff had a medically determinable impairment that could reasonably be expected to cause pain (a bulging disk at C4-5 above his prior fusion), but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC assessment.  AR 17.  The ALJ found

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Plaintiff's pain testimony not credible for the following reasons: (1) no doctor prescribed narcotic

2   pain medication, referred him to a pain clinic or stated unequivocally that he needed additional

3   surgery; (2) Plaintiff did not pursue Dr. Peled's opinion that surgery could be an alternative to

4   periodic injections (depending on response to a Botox injection that insurance would not pay for and

5   Plaintiff did not pursue) to relieve headache pain because he did not want additional surgery; (3)

6   Plaintiff failed to pursue any treatment option despite his claim that his pain was on a constant level

7   of 7 or 8 out of 10; (4) Plaintiff was able to volunteer several hours per week; (5) there was no

8   evidence that Plaintiff could not care for his personal needs and drove as necessary within San

9   Francisco; (6) there were multiple suggestions in the record that Plaintiff continued to work after the

10  claimed onset date; and (7) a notation that Plaintiff was 'muscular," which was inconsistent with

11  Plaintiff's claim that he was physically limited for the two years preceding the examination.  AR 17-

12  18.  However, at least one basis for the ALJ's decision is demonstrably incorrect and so the Court

13  remands this matter for consideration of whether the ALJ's decision would have been different

14  absent this error.

15       Although the ALJ concluded that no doctor prescribed narcotic pain medication to Plaintiff,

16  there is evidence that he was prescribed Vicodin, Darvocet, and Ultram and in fact there was some

17  concern that he was addicted to pain medication.  See AR 220, 412, 424, 516, 525.  Further, while

18  he was not sent to a pain clinic, he received multiple pain treatments including physical therapy,

19  nerve blocks, branch blocks, epidural injections, and a TNS unit.  AR 70, 91-92, 475, 480, 482, 486,

20  511, 518-20.  Although the ALJ noted Dr. Taylor's testimony that Plaintiff's pain could be relieved

21  through medication and his conservative course of treatment (AR 18), Plaintiff testified that this

22  approach was not working (see, e.g., AR 524-25).  Accordingly, the ALJ did not provide clear and

23  convincing reasons to support this basis for discrediting Plaintiff's testimony regarding pain.

24       Plaintiff also argues that his decision not to pursue a Botox injection where his workers'

25  compensation insurance would not pay for it is insufficient to reject his pain testimony because he

26  testified that he could not afford the injection on his own.  AR 66-67, 73-75, 88-89, 513; see, e.g.,

27  Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007); see also Carmickle v. Commissioner, 533 F.3d

28  1155, 1162 (9th Cir. 2007) (stating that "although a conservative course of treatment can undermine

United States District Court
For the Northern District of California

1   allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility

2   where the claimant has a good reason for not seeking more aggressive treatment").  The government

3   counters that Botox injections are usually not covered by insurance, and it was reasonable for the

4   ALJ to rely on Plaintiff's refusal to spend money on a simple injection that could relieve his

5   headaches as a reason to reject his credibility.  However, the government cites no case making an

6   exception for relatively inexpensive, simple treatments where there is uncontradicted testimony from

7   the Plaintiff that he could not afford the treatment.  See AR 73 (stating that he had no income, but

8   admitted that he did not know how much one injection of Botox would cost out of pocket).

9   Therefore, the failure to obtain the Botox treatment was not a sufficient reason for the ALJ to reject

10  the credibility of his pain testimony.

11          The ALJ went on to decide that: "In any event, the claimant testified that he did not want any

12  more surgery, including the option for additional fusion surgery at the adjacent level to relieve his

13  neck pain and symptoms."  AR 17.  Thus, it appears that the ALJ also relied on Plaintiff's refusal to

14  consider additional surgery as a reason for rejecting his credibility.  Even if the ALJ could properly

15  take into account the refusal to consider pain treatment surgery as a reason to reject the credibility of

16  Plaintiff's pain testimony, Plaintiff had valid reasons for not wanting additional surgery; specifically

17  that he did not know the previous surgery was going to cause a "domino effect" and there was no

18  guarantee that an additional surgery would control his pain, and that Dr. Taylor agreed his hesitancy

19  was "understandable."  AR 67-70, 339.  Thus, the ALJ should not have rejected these reasons in

20  favor of objective medical evidence indicating that surgery could alleviate Plaintiff's pain.

21          Additionally, Plaintiff contends that the ALJ's finding that Plaintiff was able to volunteer

22  several hours per week is not a clear and convincing reason to discredit Plaintiff's testimony,

23  because volunteering for five to six hours per week is "not akin to working in a competitive

24  environment on a full time basis."  Motion at 20, citing Orn v. Astrue, 495 F.3d at 639.  However, in

25  addition to his volunteer work, the ALJ also relied on the fact that Plaintiff could drive, take care of

26  his personal needs, and may have performed some work after his claimed onset date.  Plaintiff

27  argues that these activities also should not be considered because there is no evidence that they are

28  transferable to a work setting or that he spends a considerable part of his day on them.  See id.

United States District Court
For the Northern District of California

1   Plaintiff relies on Orn, where the Ninth Circuit held that an ALJ erred in determining that the

2   activities of reading, watching television, and coloring in coloring books were transferrable or that

3   they occupied a substantial part of the claimant's day.  Id.  These types of passive activities are

4   plainly distinguishable from activities that Plaintiff was able to do on a regular basis such as driving

5   and volunteering with troubled children, and apparently performing construction and other work on

6   occasion.[2]  The ALJ did not err in considering all of these activities together as part of his

7   determination that Plaintiff's pain testimony lacked credibility.  See Stubbs-Danielson v. Astrue, 539

8   F.3d 1169, 1175 (9th Cir. 2008); Bray v. Astrue, 554 F.3d 1219, 1227 (9th Cir. 2009).

9          Accordingly, Plaintiff's motion for summary judgment is granted in part because the ALJ

10  erred in discrediting Plaintiff's testimony.  This matter is remanded for determination of whether

11  consideration of Plaintiff's testimony would change the ALJ's decision in this case.

12  **C.     The ALJ Did Not Err in Determining That Plaintiff Does Not Have A Severe
            Mental Impairment**

13

14         As a third basis for remand, Plaintiff contends that the ALJ erred at step two of the sequential

15  process by finding that Plaintiff did not have a severe mental impairment.  A severe impairment is

16  one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."

17  20 C.F.R. § 404.1520(c).  In considering Plaintiff's alleged mental impairment, the ALJ properly

18  considered four factors: activities of daily living, social functioning, concentration, persistence or

19  pace, and episodes of decompensation.  See 20 C.F.R. § 404.1520a.  He determined that Plaintiff had

20  mild limitations in the first three categories and no periods of decompensation.  AR 13-14

21         Plaintiff argues that, despite the ALJ's findings to the contrary, the evidence shows that his

22  depression had more than a slight or minimal effect on his ability to perform basic work activities, so

23  it should have been considered a severe mental impairment.  To support this contention, he relies on

24  his previous argument that the ALJ improperly discredited Dr. Heitner and Dr. Howard's opinions.

25  He also contends that the ALJ similarly erred in discounting the opinion of state agency physician

26  ────────────────

27         [2]   Plaintiff points out that, elsewhere in his opinion, the ALJ determined that Plaintiff had not
    engaged in substantial gainful activity since November 30, 2006, the alleged onset date.  AR 13.  He
    argues that the ALJ's reliance on evidence that he worked following his onset date should therefore be
28  ignored.  However, even if the alleged construction and other work was not "substantial gainful activity"
    under the statutory definition, the ALJ could still consider as part of his credibility determination
    evidence that Plaintiff was able to do manual and other labor.

United States District Court
For the Northern District of California

Dr. Moreno that he was mildly limited in daily living activities and moderately limited in social functioning, concentration, persistence or pace, and his ability to understand and carry out detailed instructions, maintain concentration, and interact with the public. AR 14, 458, 466, 469-70. See AR 18 (discounting opinions of Dr. Heitner, Dr. Howard and Dr. Moreno because "the extent of treatment and medication usage is not consistent with a condition that would more than minimally effect his ability to perform the basic requirements of work").

However, the ALJ also relied on Plaintiff's GAF score of 60, which he stated indicates that any depressive impairment is not severe. AR 13. Plaintiff argues that a GAF score of 60 indicates "moderate" symptoms and difficulty in functioning, and that this supports a finding of severe impairment. See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders, 4th ed., 2000, at 34. However, Plaintiff cites no law to support his argument that the few "moderate" limitations as reflected in Dr. Moreno's report or the GAF score actually mean "severe." Moreover, Dr. Moreno ultimately concluded that Plaintiff was capable of understanding, remembering, carrying out, and maintaining concentration, persistence and pace for simple repetitive tasks, relating appropriately and effectively with others, and adjusting to routine changes in a work setting – and did not opine that Plaintiff had depression or any severe disability. AR 471. Similar findings of functional capacity have been interpreted to mean the claimant is capable of at least unskilled work. See Hoopai v. Astrue, 499 F.3d 1071, 1076-77 (9th Cir. 2007). Further, the government points to other portions of the ALJ's decision that reference the underlying record and explain his conclusion that Plaintiff's alleged depression did not rise to the level of a severe impairment, including his volunteer and other post-onset work.

In addition, Plaintiff argues that the ALJ erred in not considering Plaintiff's depression in conjunction with his physical impairments in his RFC assessment. However, since the ALJ determined that Plaintiff did have a "severe" physical impairment, whether or not he also considered Plaintiff's claimed depression in coming to this conclusion would not have affected his decision. Further, despite his conclusion that Plaintiff did not have a severe mental impairment at step two, the ALJ continued to reference and consider evidence relating to Plaintiff's mental health status throughout his opinion. See AR 16-18. Viewed as a whole, the ALJ's decision supports his

determination that Plaintiff's claimed depression was not a severe mental impairment that, alone or in conjunction with his physical limitations, rendered him totally disabled within the meaning of the Act.

**D.      The ALJ Erred In Relying On Vocational Expert Testimony**

Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony that he could perform his past work or other work in the national economy.  He contends that the hypothetical questions posed to the vocational expert during his hearing did not reflect all of the functional limitations outlined by his doctors and that he testified to, and therefore the opinion has no evidentiary value.  See Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) ("If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy."); Lewis v. Apfel, 263 F.3d 503, 517 (9th Cir. 2001).  This is essentially a repetition of Plaintiff's arguments above; namely, that the ALJ improperly discredited certain medical testimony and Plaintiff's own pain testimony in favor of other evidence.  To the extent that the Court's ruling on those issues affected the ALJ's consideration of the vocational expert's testimony, this matter is remanded for further consideration.

**CONCLUSION**

Plaintiff's Motion for Summary Judgment is granted in part and denied in part.  Defendant's Cross-Motion for Summary Judgment is granted in part and denied in part.  This matter is remanded to the ALJ as stated in this Order.

**IT IS SO ORDERED.**

Dated: February 9, 2012

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

22